Good morning. Thank you for your patience as we worked out some technical difficulties this morning, but I'm really glad we're all here. Thank you for appearing by video. We have one case on calendar today, which is Castillo v. Barr, number 19-72745. And before we get started, Judge Wallace and I would just like to thank Judge Lasnik, who's sitting with us by designation from the Western District of Washington. He is practically a member of the Ninth Circuit. He sits with us so often, and we could not survive without him. And we love sitting with him, and we really appreciate his help. And with that, we could get started. Each side has 15 minutes. All right, I think that's my cue. So yes, so may it please the court, my name is Michael Kagan. I represent Juan Castillo, the petitioner in this case. I'd like to reserve five minutes of my time. And I don't know, and I was going to ask about the courtroom clock, and I see it's working now. I want to address two main things in my initial argument today. First, and obviously most important since we're back for the second time on this case, I want to address the new BIA decision, which replaces the errors that this court pointed out last time with a new set of errors, and does not show engagement with the full record in this case. And second, to return to the issue of aggregate risk, which as the panel's familiar, has been discussed thoroughly throughout this case and remains an overarching issue in the way the agency has adjudicated this. And I do think the party's positions have evolved slightly in a way that may be helpful to the court. Let me start with the new BIA decision. Obviously, the remand focused on the assessment of the Dr. Borman's testimony, and I asked for clarification about whether the board considered him to be credible. And the board clarified that emphatically, that he is to be considered fully credible. That said, therefore, the board, to discount his conclusions and his analysis of the case, should have a reasoned explanation, a cogent explanation. The reasons that the board gave are not cogent, and some of them are not even probative. So let me go through those. Could I just ask, if we agree with you that the board had bad reasons for not crediting the expert, and we thought that the expert should be credited at this point, does that mean your client necessarily wins? Well, certainly, if the expert's conclusions were to be adopted, in the terms he did, he would, because the expert's testimony actually addressed all of the elements for a CAT claim, both level of risk, both individual risks to him and in the aggregate, found them to be at the highest possible level, and the role of the government. I was going to say, isn't the problem not credibility? They've made credibility, it's the weight given, and those are different. That is, it can be credible, but they get little or no weight for justifiable reasons. You still could lose. So why can't, would you just focus, if you could, why the weight given, they give lesser weight, what's wrong with that? So we've never contested that an expert, theoretically, could be credible, but would not be entitled to weight, but the reasons for not giving weight can't be arbitrary, and they'd be clearly reasoned. So that's, if I go back, actually, that was what I was going to address originally. The first reason the BIA gave for the testimony related to his supposed knowledge and attention between an oral testimony about a Nevada prison gang, the MRU gang. As we pointed out, if you actually read the script and his written report, there's just no conviction there. He never claimed. Secondly, it's not probative. This case is about going back to El Salvador and what would happen there. Dr. Borman was offered as an expert about El Salvador. His knowledge of a Nevada prison gang is really neither here nor there. That's not a cogent reason. Second reason related to this issue of extermination groups or extermination strategy. The board actually showed no awareness, actually, that the extermination groups work, that aspect of Dr. Borman's testimony was corroborated in the record. They didn't engage with that aspect of the record. The parties have now gotten into an argument about strategy versus which we argue is a distinction without much difference. That, again, is not probative and actually indicates a really problematic issue with the BIA's decision that it didn't engage with the record. The third reason was an adoption of the IJ's long dissection of Dr. Borman's testimony, which was based entirely on the chain of events analysis from JFF. I don't know, to be clear. One thing I would add is we should also remember there's a large record here beyond Dr. Borman's testimony, too. There's the Harvard report. There's several State Department reports, a great deal of news articles about individual atrocities, all of which indicate that gang members and high-level gang members are highly targeted by the Salvadoran government. The evidence emanates from several different parts of the Salvadoran government and vigilante groups, that's where the extermination groups come in, that are actively supported by the Salvadoran government. Now, I went into the aggregate risk. I think the government has conceived in their brief that the BIA has adopted the IJ's reasoning. Four whole pages of that reasoning was based on JFF. That's the chain of events case. Chain of events analysis is the center of the analysis that the agency is standing on here. I think what's helpful now in the second time that we have come before you is that the government has conceded the chain of events analysis is not compatible with aggregate risk. It's not a replacement for it. And we agree also that there are cases where both may be appropriate within the same case, but they have to be used carefully for the right kind of risk. When risk B depends on risk A, chain of events analysis, and we think that is a very, very small and largely insignificant part of this case. The evidence in this case is that Mr. Castillo faces risks from immigration officials that are separate from local police, vigilante groups separate from the others. And then beyond that, if he is lucky enough to survive those risks, then he has to face the gangs in El Salvador. And chain of events analysis just is not a proper legal way of analyzing those risks. Beyond that, that we think that the BIA and the... Can I interrupt you for a second? So if we agreed with you that the agency needed to give full weight to the expert's testimony and that the risk that the expert testifies about and that you're speaking about now is high enough to show that he has a likelihood of torture, what do we do about government acquiescence? Because I'm not sure the agency has reached that yet. So do we still need to remand for the agency to consider that? I don't think so for a couple of reasons. The BIA has actually addressed it, but I think there was a legal error in the way they've addressed it. I just went through the different risks that Mr. Castillo faces. Four out of those five all emanate directly from the government. So if you apply this to the court's holdings in Parada and Barajas Romero, I don't think acquiescence is really a live issue because the main threats that Mr. Castillo faces are emanating directly from the government. I'd also note, Justin, even in terms of the gangs acting on their own, non-state actors, which is the only place I think that acquiescence is really even a live issue, there is evidence in the record that the court can rely on to indicate that the government would not protect Mr. Castillo because the government would perceive him as a gang member. So they would not care if he is a victim of the police. You can find that, for example, in the Harvard report at pages 926 to 930. So at this point, the BIA has looked at this case twice. The IJ once. The BIA has clarified that they find the experts fully credible. And moreover, I'd also note that it's important for this court, the BIA has acknowledged the baseline. Even with all the errors that we've pointed out, there is a baseline that the agency is already acknowledging that he's at some risk. The only issue always was getting to the required line. So they've acknowledged that baseline, even with all the mistakes that we've pointed out, even without engagement with the record that's required. When you said that they have reached the acquiescence issue, where are you talking about that being in the record? I don't see it in the most recent decision that we're reviewing unless perhaps I've missed it. If you look, they have reached it. I wouldn't agree with the conclusion that they've reached, but on page three of the most recent BIA decision, I do apologize that it's not perhaps the same exact page number as in the administrative record. So in the middle two paragraphs, they claim that the government is taking imperfect steps to combat extrajudicial crimes. That's addressing acquiescence. In fact, the word acquiescence appears in that third paragraph. So I do think they've addressed it. I don't think they've addressed it correctly, particularly given that these threats that they're talking about here are coming directly from government agents. So under the color of law standard that this court has adopted for acquiescence under CAT, I don't think acquiescence is really a... It often is a in this one, it's a bit more peripheral, not totally irrelevant, but it's a bit more peripheral because we're talking about threats emanating directly from the government. I have spoken for more than 10 minutes, which is what I hope to reach. I don't want to cut any of you off. Let me just ask you if I could, counsel, going to Judge Wallace's point, as a trial judge, we sometimes find a witness credible in the sense that they're telling the truth as they see it, but we don't agree with some of the conclusions of an expert. So you're not contesting the idea that a person could be deemed credible, but their testimony not persuade a trier of fact. You're saying the reasons given here don't track. They're either inappropriate or they're wrong. So if the remand were to come up with more cogent reasons why a trier of fact didn't find Dr. Borman's testimony persuasive, that could still happen, couldn't it? Well, I guess it's theoretically possible, Your Honor, but they've had two chances. And so I think a fair reading of the record is that Dr. Borman's expertise was quite bolstered. I'd note that the fact that he testified twice, the second time after a research visit to El Salvador, that's where he came back and reported about extermination groups. And then that was corroborated about a month or two later by the newest State Department report, which also mentioned extermination groups. That really bolsters should, I think, any reasonable fact finder hit his expertise. I think you've described our position correctly, but the board has looked at this twice. And I just don't think there are cogent reasons there for a rejection of his conclusions or discounting to the level that they are relying on. Well, Dr. Borman is not a stranger to the court system. We have rejected his testimony before. Another circuit has rejected his testimony before. Wouldn't it make sense because of that, that we would send it back for a statement of reasons? The board just didn't do a very good job on this. I see your point. They've had a couple of shots, but I also understand that they are really overwhelmed with we ought to give them with direction to make a determination. Your Honor, thank you for that question, Judge Wallace. I actually would like to say two things about that. Even according to the board, my client is at some risk of torture or death. So I think a careful decision is not too much to expect of the agency responsible for making it. Secondly, let me address, actually, the government relies on this extensively, these other cases where Dr. Borman appears. I've read them all. I don't really see anywhere this court actually actively engaged with Dr. Borman's testimony and rejected his testimony, per se. It's actually our position is it's very hard to make of those cases because they're on different factual records. Some of them, for example, Del Cid Marroquin involved someone who was a member of a Mexican gang, but was from El Salvador. That already is a pretty significant difference, and I don't know how far it goes because I can't see that record. And so, one, I just think that's not correct. If we really wanted to look at Dr. Borman's testimony, we should look at the full universe of cases where his testimony has been accepted at the IJ level. I would also refer, Your Honors, to the Quinteros case from the Third Circuit, which not only involved Dr. Borman, but also involved the Harvard report, the same one that we rely on that's in our record here. And in that case, not only was the board reversed, but I think its stubbornness to reconsider and to consider all the efforts was quite pointedly downward by the board. So, I know we've taken you into your rebuttal time. I'll still give you three minutes for rebuttal, so you can plan on that. Thank you, Your Honor. Mr. Stanton, I think you might be muted. There we go. I apologize very much. It's my wife's computer, and so, and thick screen. So, anyway. All right. May it please the court. Petitioner is not the first person who is fearing harm in former Charters El Salvador because he was a former gang member. There have been many cases where this court has upheld the denial of cap protection for various similar situated petitioners. The board cited quite a few of them just last week. The court did so again. And petitioner says that every case depends on its own record. And the point is true in isolation, but at some point, I mean, the evidence presented in those prior cases is pretty much the same as the evidence presented here. Take, for example, the issue of governmental acquiescence with respect to non-state actors, and the vigilante groups are indeed non-state actors. So, I mean, the immigration judge found that there's sufficient evidence that the government of El Salvador was engaging, combating the gangs, among other things, the old Mano Duro laws. And even in the 2016 country conditions report that the petitioner submitted to the board on the original appeal, on page 95, the same page where the traditional groups that extermination groups are mentioned, there's also a paragraph indicating that the Salvadoran police are engaging with the gangs. So, and of course, as Mr. Kagan acknowledged, the board, in the most recent opinion, also cited evidence that the government of El Salvador is trying to combat the extrajudicial killings, the extermination groups. And that's, I believe that's a very, very important point here, because I couldn't, I admittedly could not find a decision that specifically said this, but the government's position is with respect when a petitioner is alleging harm from different sources, and there's evidence of acquiescence, no acquiescence with respect to some sources, we believe those sources should not be part of the aggregation analysis of the core analysis. So, if the court were to uphold the agency's findings, that there's sufficient evidence showing that the government of El Salvador is combating these extrajudicial groups, and also combating the gangs, then all petitioners left with potential sources of torture are the police themselves, and the immigration officials. Again, I do not have a case that says that, but that's the government. Don't we have cases that say the government, we have to consider whether the government is actually effective in its efforts. I mean, if the government is making ineffective efforts, those efforts don't count under our case law. So I'm not, I'm not very persuaded, I think, by the argument you're making here. And maybe you could speak to whether the agency has even really reached this issue. Your opposing counsel pointed to the fact that acquiescence is mentioned, and I think it is mentioned, but at least I had understood the thrust of what the BIA was saying to be that the risk of torture wasn't high enough, and that was partly because of efforts the government was making, rather than really viewing it as two separate prongs that it was treating separately here. Well, my recollection was that the board did use the word acquiescence, and I don't have the decision in front of me, but I'm virtually certain the immigration judge did as well. I mean, there was, I mean, I can't recall offhand whether the immigration judge specifically used the word acquiescence, but he did make the finding that the government is engaged and trying to combat the gangs, which is what acquiescence actually is. So I don't know if that satisfies your honor. So maybe we could turn to your argument that we have other cases that are similar that should show us that we need to reject this one. I looked at your other cases that you were citing. For example, Chavez, from our court, it's unpublished, so we usually don't talk about these, but because Dr. Borman and other similar things that I have now been raised, I'm going to ask about this unpublished case. I mean, in Chavez, the petitioner specifically had tattoos that were not visible, and that's not the situation for Mr. Castillo, as I understand it. Plus, it's not just his tattoos, but also the snitching against the gangs that puts him at risk. So I don't really see a case that you've cited that is in a similar posture. Well, in Chavez, the petitioner was also an older man, and he was particularly the same age. Yes, but the point was he's older and doesn't have visible tattoos, and the fact that he's older means he won't be targeted now. But Mr. Castillo's reason for being targeted is that he snitched against the gangs. So that has nothing to do with him being older or not. It's not like he's about to be recruited de novo. I mean, the issue is whether he is going to have retribution against him. And I didn't see a case that you were citing that really spoke to that, especially in combination with the tattoos. All right. Well, with respect to tattoos, I mean, the immigration judge cited that there was a case from about 2008, Arretega, if I'm recalling correctly. So there was an immigration judge opinion that was discussed extensively towards the end on pages 11 and 12, if I'm recalling correctly. I mean, an older case, but also like a former gang member returned to El Salvador. He had tattoos, gang tattoos. And one of the reasons why the immigration judge found that case persuasive, as opposed to Cole, was because there was no evidence in the State Department reports saying that people with tattoos were targeted in El Salvador as former gang members. I'm sorry for torture. Whereas in Honduras, a different country saying that such people were indeed at risk. So I don't know the case, but it is published up. But again, Mr. Castillo, as I understand it, his fear of torture isn't only because of the tattoos, it's also because of the snitching. So the tattoos might make him identifiable. And then the snitching is the thing that's going to lead to the problem. So, at least part of the risk of the problem. So I'm still not sure how you respond to that. Well, with respect to the proverbial snitching, I mean, if I'm recalling correctly, in the board's first opinion, and possibly the immigration judge's opinion, it talks about there was only one person who knew that Mr. Castillo had debriefed whoever returned to El Salvador. And there was no evidence this person was even still in El Salvador, or if he was still even alive, or the debriefing that occurred back in, I believe, 2008. I mean, Mr. Kagan can correct me if I'm mistaken about that. But the point that the agency was making, it was still too far attenuated down the road. And so if it was more recent, perhaps, but at some point, there has to be the proverbial statute of limitations on when this person would still face harm. Because I believe this court, it's not sat in a brief, but the longer back in time that a particular event that will potentially cause harm, it is the less likely it is to actually result in harm in the future. So that's not in a brief, but that's, I mean... Could I ask you a question? I'm a little concerned about the board's statement that they rejected our characterization of the IJ's credibility finding, and said what we did in our lesson, and then they say we disagree. The Seventh Circuit had the same problem a little earlier and pointed out with no light gloves on that there is a separation of powers and a board is off the charts. I happen to agree with the Seventh Circuit. But what do we do about that? It's clearly, if the Seventh Circuit is right, it's clearly the board was wrong in doing it. And what if, assuming that we find that so, what happens to this case? Okay, well, I mean, I do that. Well, I mean, I understand the court's point that it doesn't appreciate being told that by the board that it's wrong, especially when it's an imperial tribunal to the court. I fully respect that. In this particular case, I would submit that any error the board did here will be harmless because the board did assume that Dr. Borman was fully credible and assumed, as your Honor said earlier, that he was telling the truth. The board has no doubt that he watched the video at some point, but as you were saying earlier, and as Judge Leisnick was as well, the board simply did not accept. Saying that a witness is credible or an expert is credible is not the same as necessarily adopting his ultimate conclusions as positive. So, I wonder if the board is going to take the position, or you're going to take the position that the board should have another look at this, because they failed to give reasons. They were off the mark when they rejected the Ninth Circuit. Do we have enough in what's left of the board decision to rule, or do we need to send it back for them to do their work correctly? The government's position is that this is a good board decision. I mean, if the court disagrees, then it's up to the court to decide what to do. But, I mean, like I said, Dr. Borman said that there's an extermination strategy in this case. Petitioner's position is that the very fact that extermination groups exist in El Salvador doesn't necessarily mean that they're going to be governmental strategy. But even in the 2016 country conditions report that the petitioner submitted itself, the report says that the money supporting these extermination groups is coming from groups outside of El Salvador. El Salvador national is living elsewhere. So, to the extent Dr. Borman said that the government is sponsoring these extermination groups, and therefore it's a strategy, that's just not supported in the records. So, I mean, at best, absolute best, there was some support in the 2010 Harvard study, which the board said its first opinion is far too back in time to be reliable. And, again, the evidence of non-acquiescence to these extermination groups supports the board's decision not to afford Dr. Borman's conclusions of full weight in that strategy of extermination groups here. If we disagree with you, and we think that the record talking about extermination groups is close enough to extermination strategy, and that experts are allowed to rely on things that aren't in the record, so the video point doesn't make any sense, etc., why should the board get another chance? It's had two chances already to consider this It's nothing of the acquiescence issue. So, I mean, unless this court is prepared to rule that Dr. Borman's opinion about immigration officers is enough to give this person cap protection, the problem is that there's nothing specifically particular about this positioner that would support a ruling that he is more likely than not to be tortured and return to Salvador. I mean, a lot of people can make that claim. He has not been tortured in the past. He was in prison for almost 10 years with other active gang members, and he was not harmed at all during this time. The positioner claimed like the only reason that that occurred was because he was under protected custody by the prison. That is not an accurate reading of the records. So DHS, he made the same argument to the immigration judge. DHS wrote an entire brief disputing he was ever under protected custody while he was in prison. It's in pages 10, 21 to 24 of the administrative record. DHS went through the... Did the IJ make a finding about that? Well, I mean, the immigration judge held it like... One of the reasons the immigration judge held in support, it was unlikely he would be sought out by the gangs because nothing happened to him in the prison. So, I mean, the agency made a finding. I mean, I would say the agency implicitly made the finding that agreed with the government that he was not in any danger of torture or even physically mistreated at all while he was in prison. So, I mean... But is there... Sorry, I might just be misremembering or not remembering this. Does the IJ have a finding that he was not actually in protected custody? I'm sorry. I think I'm sort of behind this. I'm sorry, Judge Friedman. Could you repeat that? Does the IJ have a finding that Castillo was not in protected custody? He does not... The immigration judge did not make that specific finding, but I would think that the finding the immigration judge did make, that finding would certainly be implicit in a reading of the immigration judge's opinion. That nothing happened to him while he was in prison. So, I would think implicitly rejected his claim that he was in protected custody when weighed against the argument that DHS was actually making. Let me ask one other question. It may not matter, but it may. Is he still in prison? And if so, is there a some date when he's getting out? It seems to me that it's going to happen as long as he's still behind bars. My understanding is he's still incarcerated. Mr. Kagan can correct me if I'm wrong, but my understanding is he's due for a bond hearing in front of an immigration judge soon. You think what? He's due for a bond hearing in front of an immigration judge soon, Your Honor, next week, I believe. Although, if that's not correct, I'm sure Mr. Kagan can... I hope Mr. Kagan can correct me. A bond hearing won't do any good unless you're out of jail. Well, he's not in state custody anymore, is he, on the crime? I understand he's still incarcerated. But not on the crime. Oh, I thought he was in immigration detention. Immigration custody. Immigration custody, yes. But his prison term was short. Ah, okay. Thank you. Again, I mean, I'm a little over time right now, but I'll be happy to stay up here and answer any additional questions you may have. Thank you. Thank you, counsel. Mr. Kagan, you have three minutes for rebuttal. Your Honor, I wonder if you might be a little loose on the clock, so that I can correct a couple of things that Mr. Stanton... Go ahead. Very quickly. He debriefed in 2005. I don't think that's either here or there in terms of the dates. It's a factual matter. He is currently in DHS custody under immigration custody. So he was paroled. The reason, in fact, we're here today is that he was paroled essentially after Miller v. Alabama, because the homicide he was convicted of occurred when he was 15 years old. We have requested a bond hearing. We actually had the initial bond hearing. DHS disputed jurisdiction. Not prepared to argue that with you today, because he is detained in Alabama, so outside the Ninth Circuit. So I'm not actually sure what will happen to the bond hearing. But is it true that he has not been out of custody? Like he was in prison, and now he's in immigration detention, so he hasn't had a chance to find out whether the gang is trying to kill him. Yes, that's correct. He has been in either state or federal custody since he was 15 years old. Okay, I want to address a couple that have come up. I want to return to the essence, maybe even fine-tune it just a little bit more. The government's argument is that even just focusing us, as I said before, more narrowly on non-state actors, as I said, they're not even necessarily the most important in this case, that the Salvadoran government is fighting the gangs. We don't dispute that. But I think that's not quite the right way to look at acquiescence about a general fighting against the gangs. Would they acquiesce to the torture or murder of Mr. Castillo? That's where the acquiescence would come in. It's entirely logical that they could generally fight the gangs, but also see the gangs targeting another gang member, or a former gang member, and not care. That would also be acquiescence. And that's actually what the record evidence that I pointed to earlier shows, that they would acquiesce to this type of violence. And his situation generally is that he is trapped between several different forces in El Salvador. It's not just that he snitched on gangs, which would make the gangs target him. It's also that he's a bona fide gang member, former gang member, with MS-13 tattoos on his body that are very easy to spot, with a high-profile homicide conviction that was gang aggravated, that anyone who Googles his name can find out about. He is in a unique position. All the evidence in the record shows that he is at the maximum level of risk of anyone. He is not just a generic person, and I think that's the flaw in the BIA and the government's approach. This case is not about a lot of people. It's not about all the other Salvadoran former gang members. This court doesn't have to find that those other decisions were wrong. Mr. Castillo is in a uniquely bad position if returned to El Salvador. That's what we think the record shows and has established very clearly now, especially now that we have seen, I think, after endless attempts to put holes in it, the expert's testimony holding up very well is fully credible, and there's a lot of record and corroboration to back up what he said. Thank you, counsel. Thank you, both sides, for the helpful arguments, and thank you again for appearing by video. We appreciate your arguments and the cases submitted. Thank you so much.
judges: Wallace, Friedland, Lasnik